CLERK'S OFFICE
A TRUE COPY
Oct 08, 2024
s/ D. Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Information associated with the Titan Mail accounts more fully described in Attachment A, which is stored at premises owned, maintained, controlled, or operated by Titan Mail and/or its registered agent, Flock FZ-LLC DMCC, a company headquartered in Dubai, United Arab Emirates.

Case No. 24 MJ 205

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the ______ District of ______, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 USC 1589(a); 18 USC 1546 (a); 18 USC 1351; 18 USC 1343; 18 USC 1001(a) | Forced Labor; Fraud and Misuse of Visas, Permits, and Other Documents; Fraud in Foreign Labor Contracting; Wire Fraud; False Statements; Harboring Certain Aliens for Financial Gain (8 USC 1324(a)(1)(A)(iii), (B)(i)) |

The application is based on these facts:

See attached affidavit.

- ☐ Continued on the attached sheet.
- ☑ Delayed notice of 30 days *(give exact ending date if more than 30 days:* ______ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

KEVIN CARLSON Digitally signed by KEVIN CARLSON Date: 2024.10.07 12:43:57 -05'00'

*Applicant's signature*

Special Agent Kevin Carlson, DOL-OIG

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 10/08/2024

William E. Duffin

*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable William E. Duffin, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, KEVIN CARLSON, being first duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the United States Department of Labor's Office of Inspector General (DOL-OIG) and have been so employed since November 2021. Prior to being a Special Agent with DOL-OIG, I served as an agent with the U.S. Border Patrol for approximately three years, during which time I investigated violations of federal laws related to criminal violations, as well as violations of immigration and nationality laws. I attended the Border Patrol Academy and Criminal Investigator Training Program at various Federal Law Enforcement Training Centers. During my time as a federal law enforcement officer, I have participated in multiple federal search warrants, including reviewing evidence collected pursuant to search warrants.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses.

## PURPOSE OF AFFIDAVIT

3. I make this affidavit in support of applications for two search warrants:

a. A search warrant requiring **Meta Platforms, Inc. ("Meta")**, a company headquartered in Menlo Park, California, to disclose to the government records and other information in its possession that is stored at premises maintained, controlled, or operated by **Meta**, pertaining to the following **Instagram** user ID:

| Account Name | Uniform Resource Locator (URL) | Instagram ID |
|---|---|---|
| Staffing Solution R Us | https://www.instagram.com/solnr_us/ | 56345075807 |

b. A search warrant requiring **Titan Mail** ("**Titan**") and its registered agent, **Flock FZ-LLC DMCC** ("**Flock**"), to disclose to the government records and other information in its possession that is stored at premises maintained, controlled, or operated by **Titan/Flock**, pertaining to the following email addresses/accounts:[1]

i. Admin@solnrus.com
ii. Vickacey@solnrus.com
iii. Victoria@solnrus.com
iv. Keddorhorie@solnrus.com
v. Ysanne@solnrus.com
vi. Shinel@solnrus.com
vii. Marvin@solnrus.com
viii. Myron@solnrus.com

4. This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) & 2703(c)(1)(A). Specifically, the Court is "a district court of the United States... that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

5. Based on my training and experience, along with the facts set forth in this affidavit, there is probable cause to believe that Keddorhorie McIntosh, Staffing Solution R Us (also known as Staffing Solutions R Us), and others have committed violations of Title 18, United States Code, Sections 1589(a) (forced labor), 1546(a) (fraud and misuse of visas, permits, and other documents), 1351 (fraud in foreign

[1] **Flock** is based in the United Arab Emirates, however **Titan** does business worldwide, including in the United States. Your Affiant has contacted **Titan**, and they have responded agreeing to abide by United States legal process.

labor contracting), 1343 (wire fraud), and 1001(a) (false statements); and Title 8, United States Code, Sections 1324(a)(1)(A)(iii) and (B)(i) (bringing in and harboring certain aliens for financial gain), and that evidence related to these crimes, as described in Attachment B to each warrant, will be found in the accounts to be searched as described in Attachment A to each warrant.

6. This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter. Interviews and conversations referenced in this affidavit are in summary form and do not purport to be verbatim recitations or translations of those interviews. Dates, times, dollar values, and government figures referenced are approximations.

## PROBABLE CAUSE

### I. Background Regarding the H-2B Visa Program

7. From training regarding the U.S. visa programs, I know that foreign nationals cannot work for pay in the U.S. without prior authorization from the U.S. government. Foreign nationals may obtain work authorization in the U.S. through a nonimmigrant visa petitioned for on their behalf by a qualifying U.S.-based employer.[2] A nonimmigrant visa allows a foreign national to enter the U.S. temporarily, to fulfill a specific purpose.[3]

8. One means by which foreign nationals can obtain authorization to work for pay in the U.S. is by obtaining an H-2B nonimmigrant visa through a U.S.-based

[2] There are limited exceptions to this general procedure, not applicable here.
[3] 8 U.S.C. § 1101(a)(15).

non-agricultural employer.[4] This U.S. visa program allows foreign workers to perform temporary work in the U.S., so long as no unemployed U.S. workers can fill that job.[5] The H-2B visa allows a foreign national to work in the U.S. for a maximum uninterrupted period of three years.[6] To sponsor foreign guest workers for the H-2B visa, the prospective U.S.-based employer must submit information to the DOL, Department of Homeland Security ("DHS")/U.S. Citizenship and Immigration Services ("USCIS") and, in most cases, Department of State (DOS).

9. Generally, the Immigration and Nationality Act ("INA") limits the annual number of foreign workers who may be issued an H-2B visa to 66,000, with 33,000 for workers who begin employment in the first half of the fiscal year (October 1 - March 31) and 33,000 for those who begin employment in the second half of the fiscal year (April 1 - September 30).[7] The H-2B visa, therefore, is a finite U.S. government benefit.

10. Before an employer can file an H-2B application, they must register with the U.S. DOL approximately four to six months prior to the company's need for workers. It is during this time that the U.S. employer indicates the temporary need for foreign labor, to include the number of positions requested, the period of employment, and the nature of services or labor. In addition, the employer must request and obtain a prevailing wage rate from the U.S. DOL starting approximately

---

[4] 8 U.S.C. § 1101(a)(15)(H)(ii)(a).
[5] Immigration and Nationality Act ("IA") 101(a)(15)(H)(ii)(b), 8 U.S.C. 1101(a)(15)(H)(ii)(b); see also 8 CFR 214.1(a)(2).
[6] 8 C.F.R. § 214.2(viii)(b).
[7] INA Sections 214(g)(1)(B) and 214(g)(10), 8 U.S.C. 1184(g)(1)(B) and 1184(g)(10).

two months before the date of need. The pay rate required for H-2B workers is a formula-based rate designed not to adversely affect U.S. workers and is generally based on the type and location(s) of the purported job classification as specific by the U.S.-based employer.

11. After receiving the prevailing wage rate, the U.S. employer posts a job order with the State Workforce Agency in the state of intended employment in order to test the local job market for interested U.S. applicants.[8] Upon the work order being accepted by the State, the U.S. employer must also engage in local recruitment efforts as directed by the U.S. DOL.[9]

12. Upon satisfying the testing of the local job market, the U.S. employer can submit a DOL Form 9142 Application for Temporary Employment Certification ("ATEC") to the U.S. DOL Employment and Training Administration (ETA) seeking labor certification. The ATEC, with few exceptions not applicable here, is transmitted to the DOL via electronic transmission to the Frances Perkins Building, 200 Constitution Avenue Northwest, Washington, D.C. This labor certification is the first step in the H-2B visa process and requires both the employer (also referred to as the "petitioner") and preparer to make certain attestations, including the wages to be paid, the locations at which the prospective H-2B workers will work, and adherence to federal regulations prohibiting the petitioner or their agents from charging H-2B workers illegal fees. An appendix to the ATEC requires the following attestations, among others, to be executed by the employer:

---

[8] 20 CFR § 655.15(b), and 20 CFR § 655.16(a).
[9] 20 CFR §§ 655.15, 655.30, 655.31, 655.32, 655.33.

i. "The offered wage is not based on commissions, bonuses or other incentives, unless the employer guarantees a wage earned every workweek that equals or exceeds the offered wage."

ii. "During the period of employment that is the subject of this application, the employer will comply with applicable Federal, State and local employment-related laws…"

iii. "The employer and its agents, attorneys, and/or employees have not sought or received, and will not seek to receive, payment of any kind from the worker for any activity related to obtaining certification or employment, including but not limited to payment of the employer's attorney or agent fees, application or petition fees, or recruitment costs. Payment includes, but is not limited to, monetary payments, wage concessions (including deductions from wages, salary, or benefits), kickbacks, bribes, tributes, in kind payments, and free labor."

iv. "Upon the separation from employment of any H-2B or U.S. worker(s) employed under this application, if such separation occurs prior to the end date of the employment specified in this application, the employer will notify the Department in writing of the separation from employment not later than 2 work days after such separation is discovered by the employer. The employer will also notify DHS in writing (or any other manner specified by DHS) of such separation of an H-2B worker."

v. "The employer will not place any H-2B workers employed pursuant to this application outside the area of intended employment or in a job classification not listed on the approved application unless the employer has obtained a new approved Form ETA-9142B."

vi. "The employer will make all deductions from workers' paychecks required by law and only those additional authorized and reasonable deductions disclosed in the job order. Deductions not disclosed will be prohibited. Reasonableness of authorized deductions is determined under the principles stated in 29 CFR part 531. The wage payment requirement in condition 5 of this Declaration will not be met where unauthorized or unreasonable deductions, deposits, rebates, or refunds reduce the wage payment below the offered wage or where the worker "kicks back" any part of the wages to the employer or another person for the employer's benefit."

vii. "The employer will cooperate with any agent of the Secretary of Labor who is exercising or attempting to exercise the

Department's authority pursuant to 8 U.S.C. 1184(c), including investigations as described in 29 CFR 503.25."

viii. "The employer will retain all documents pertaining to this application and registration, the recruitment-related documents, the payroll records, and related documents for 3 years as required by the regulations at 20 CFR 655.56 and 29 CFR 503.17."

17. After these attestations, the U.S. employer must affix his or her full name, title, and date of signature under an advisement banner reading: "I declare under penalty of perjury that I have read and reviewed this application and that to the best of my knowledge the information contained therein is true and accurate. I understand that to knowingly furnish false information in the preparation of this form and any supplement thereto or to aid, abet, or counsel another to do so is a felony punishable by a $250,000 fine or 5 years in the Federal penitentiary or both (18 U.S.C. 1001)."

18. Upon the employer/petitioner receiving certification from the Secretary of Labor through U.S. DOL, the U.S.-based employer performs the final step in the H-2B visa application process by submitting a DHS Form I-129 Petition for a Nonimmigrant Worker (commonly referred to as a "petition") to the U.S. Secretary of Homeland Security through USCIS. The I-129 package is submitted to the USCIS by mail or common carrier, and routes to a USCIS processing center. This petition typically contains relevant portions of the DOL ATEC as an attachment. This petition requests USCIS approve a specific number of named or unnamed foreign workers, and attests to many of the same particulars as listed on the ATEC, including the rate of pay and duration and location of work. The U.S.-based employer again attests to the information contained in the petition by provide the name, title and signature of

an authorized company signatory under an advisement banner reading, in relevant part, "I certify, under penalty of perjury, that I have reviewed this petition and that all of the information contained in the petition, including all responses to specific questions, and in the supporting documents, is complete, true and correct."

19. Upon USCIS approving the petition, the DOS processes the petition and informs eligible U.S. embassies or consulates overseas for the purposes of scheduling H-2B eligibility interviews for prospective foreign guest workers.

20. Upon overseas U.S. State Department officials approving applicants for H-2B visas, those applicants may apply for admission by presenting themselves to officials of the U.S. Customs and Border Protection at the U.S. border or its functional equivalent (e.g., a U.S. airport or seaport).

21. Upon satisfying a Customs and Border Protection examination, the H-2B worker is generally admitted until the end date listed on the petition, known as a Petition Expiration Date or "PED."

## II. Overview of Labor Trafficking and Other Criminality in U.S. Guest Worker Visa Programs

22. Because the H-2B visa program does not require any specialized knowledge or training and is a manual labor visa, the program appears especially attractive to foreign nationals seeking lawful opportunities to come to the U.S. to earn money in various permissible H-2B industries. These prospective workers are only authorized to work for the sponsoring U.S. employer, so many foreign guest workers feel tethered to their employer, facing the prospect of not being selected for future H-2B visas if they do not fulfill their labor requirements as directed by the employer.

23. When unscrupulous U.S. petitioners or their agents take advantage of the H-2B program, foreign guest workers can be subjected to exploitative labor conditions that are different than first promised. One common scheme that is seen in the H-2B program is commonly referred to as "petition padding," in which companies, recruiters, or petition preparers collude to seek more visa applicants on their petition than are needed for the job opening. Upon getting approved for this "padded" number of workers, and upon H-2B workers entering the U.S., the schemers send the often-unwitting H-2B visa workers to previously undisclosed employers and worksites and reap financial benefits from illicit labor "leasing."

24. Once saddled with debts to an unscrupulous employer/recruiter, H-2B visa workers often face the prospect of returning to their home country heavily indebted or are induced by the employer to unlawfully remain in the U.S., performing work in locations which contravene their visa contracts, and often facing harsh labor conditions.

## III. Overview of Businesses and Persons Named in this Affidavit

25. Staffing Solution R Us LLC (hereinafter SSRU) is a labor contractor and cleaning company that supplies contract workers, primarily H-2B visa workers from Jamaica to businesses around the United States. Your Affiant has determined that SSRU was incorporated on or about February 27, 2021 in the State of Virginia. Its principal office is registered as 2807 N. Parham Rd Ste 320, Henrico, Virginia, however according to SSRU's website, the business is "headquartered" in Atlanta, Georgia.

26. SSRU's "President CEO" is Keddorhorie MCINTOSH. MCINTOSH is a Jamaican national who is also a naturalized U.S. citizen.

27. This affidavit discusses multiple complainants, H-2B workers, and businesses whose names are known to Your Affiant but have been replaced by anonymizers in this affidavit for their safety and privacy. Your Affiant provides the summary that follows as an aide to understanding the references used in this affidavit.

28. The businesses and business representatives mentioned in this affidavit are as follows:

a. Business 1 is a hospitality company operating in Lake Geneva, WI, and the individual referred to herein as "Business 1's Representative" is an upper-level management employee of Business 1.

b. Business 2 is a hospitality company operating in Seattle, WA.

c. Business 3 is a hospitality company operating in Wisconsin Dells, WI, and the individual referred to as "Business 3's Representative" is an upper-level management employee of Business 3.

d. Business 4 is a hospitality company operating in Wisconsin Dells, WI, and the individual referred to herein as "Business 4 Representative" is an upper-level management employee of Business 4.

e. Business 5 is a hospitality company operating in Fontana, WI.

29. There are eight different complainants discussed in this affidavit and referred to as "Complainant" followed by a number. All of the complainants are citizens of Jamaica who were approved for H-2B visas to work in Lake Geneva, WI, even though many of them ultimately worked elsewhere. Although the complainants

discussed in this Affidavit worked for various hospitality businesses in this District and elsewhere, they did so as employees of SSRU and were paid by SSRU.

30. In addition to the complainants, who are all H-2B visa workers, Your Affiant discusses several other SSRU H-2B visa workers in this affidavit whose names are known to Your Affiant but have been replaced by anonymizers in this affidavit. These include H-2B Workers 1, 2, 3, 4 and 5. Your Affiant has not spoken to or interviewed any of the people referred to as "H-2B Worker #" in this affidavit.

## IV. Investigation Into MCINTOSH and "Staffing Solutions R Us"

### A. Origins of the investigation.

31. In or around February 2024, Your Affiant received a fraud referral from the U.S. DOL Wage and Hour Division ("DOL-WHD") based on first-party complaints by H-2B visa holders.[10] DOL-WHD enforces certain labor laws pertaining to general federal wage requirements, as well as certain pay and workplace issues relating to foreign guest worker visa programs.

32. In summary, the DOL-WHD allegation outlined information provided by Jamaican national H-2B visa holders who will hereinafter be referred to as "Complainant 1", "Complainant 2" and "Complainant 3" to U.S. DOL. These Complainants generally alleged that Staffing Solution R US ("SSRU" or "Staffing Solution") recruited H-2B workers from Jamaica, telling them that they would be coming to the Lake Geneva, Wisconsin area for housekeeping work; that SSRU

[10] Federal criminal investigators of U.S. DOL OIG have made no promises to any H-2B visa workers identified in this affidavit as to non-prosecution or benefits and have made no payments for information. The H-2B workers' roles in this alleged scheme remain under investigation.

illegally charged H-2B workers for their visas; and that SSRU had them work illegally for employers in other parts of the country than where their visas were issued for.

33. In summary, Complainant 1 reported on February 1, 2024, that he/she learned of H-2B housekeeping work in the U.S. through a company called "Staffing Solution" operated by Keddorhorie MCINTOSH ("MCINTOSH"). MCINTOSH and Tanique Morgan, who was a manager for SSRU, called Complainant 1 and told him/her that he/she would earn around $20 per hour but that Complainant 1 would have to pay around $1,500 to take part in the H-2B program, and that he/she would also have to pay visa processing fees.[11] After the telephone call, Complainant 1 received an email from Victoria McIntosh (SSRU Human Resources) that instructed Complainant 1 to tell immigration officials that he/she and other visa workers would be going to Wisconsin.[12] Although Complainant 1's H-2B visa was issued for work at Business 1 in Wisconsin, he/she learned through Victoria McIntosh that he/she would actually be working in the State of Washington for Business 2. Complainant 1 offered to buy his/her plane ticket to the State of Washington, however Victoria McIntosh told Complainant 1 that SSRU had to pay for a plane ticket to Wisconsin, even though Complainant 1 was going to Washington. Later, Complainant 1 grew concerned as

[11] Your Affiant is aware that 20 CFR 655.20 states that the employer and its attorney, agents and/or employees must not seek or receive payment of any kind from the H-2B worker for any activity related to obtaining employment certification, including but not limited to payment of the employer's attorney or agent fees, application or DHS petition fees, or recruitment costs, as stated in the Background Regarding the H-2B Visa Program section of this affidavit. Payment includes, but is not limited to, monetary payments, wage concessions including deductions from wages, salary, or benefits, kickbacks, bribes, tributes, in kind payments, and free labor.

[12] This is from Complainant 1's recollection; Your Affiant has not seen this email.

he/she noticed deductions to his/her paycheck that purported to be for taxes to the State of Wisconsin, even though Complainant 1 was working in Washington.

34. On February 1, 2024, Complainant 2 reported he/she had learned of housekeeping work in the U.S. through an individual named Oneal Duncan. (Your Affiant was later able to identify an H-2B visa worker by this name who was listed on the same petition used to sponsor Complainant 2.) Duncan told Complainant 2 that he/she would earn around $19 per hour in the U.S. but that he/she would have to pay a total of approximately $1,400 to Duncan and $500 to SSRU upon his/her arrival to the U.S. for visa processing fees. Although his/her visa paperwork said the H-2B work was in Wisconsin for Business 1, Complainant 2 learned on the day of his/her travel that he/she would instead be sent to the state of Washington to work for SSRU at Business 2. Complainant 2 was aware that other SSRU workers on the H-2B visa petition under which he/she was given a visa were sent to Tennessee and Florida to work for SSRU.

35. Complainant 3 informed U.S. DOL that he/she had paid a "visa fee" to SSRU in order to come do H-2B housekeeping work in the U.S. but had no other complaints about the work. Complainant 3 arrived in the United States by flying via commercial airline from Montego Bay, Jamaica, to Milwaukee, Wisconsin, with a lay-over in Atlanta, Georgia. Complainant 3 stated that he/she worked in Wisconsin at Business 1 and was not aware of other workers leaving Wisconsin to go to other U.S. states. As shown in Exhibit 3 below, however, it appears Complainant 3 flew with Complainants 1 and 2 to the Washington the day after their arrival to Milwaukee,

Wisconsin. Complainant 3 recalled a Wisconsin-based SSRU manager named Vickacey PEART, whom Your Affiant believes to be the user of the SSRU email address Vickacey@solnrus.com.

**B. Corroboration of the initial allegations.**

36. DOL-WHD collected corroborating records during their inquiry, including the following:

**Exhibit 1:** An image showing a payment (unknown method, means or bank used to complete the below transaction) by Complainant 2 to Oneal Duncan with the memo “us work program” in advance of receiving an H-2B visa.

Your Affiant received a copy of Exhibit 1 from DOL-WHD. Complainant 2 provided this image to DOL-WHD on or about February 1, 2024.

**CASH RECEIPT** No. 1

| | |
|---|---|
| Date | 21-Jul-2023 |
| Time | 06:56 |
| From | [redacted] Complainant 2 |
| Currency | USD |
| Amount | 1000.00 |
| For | us work program |
| Issued By | Oneal Duncan |
| Method of Payment | Direct Deposit |

Details:

Received in Direct Deposit from [redacted] Complainant 2 [redacted] the amount of USD 1000.00 for us work program on 21-Jul-2023 06:56. Received by Oneal Duncan (Ref: 1)

**Exhibit 2:** Delta Airlines flight confirmation records for the November 23, 2023, travel of six H-2B workers from Montego Bay, Jamaica to Milwaukee, Wisconsin via Atlanta, Georgia. (Your Affiant has redacted the six travelers’ names and annotated in red where the names of Complainants 1-3 appear on the document):

Your Affiant received a copy of Exhibit 2 from DOL-WHD.

Montego Bay, Jamaica ▶ Milwaukee, WI

Passenger Information

| Passenger | |
|---|---|
| [redacted] | Confirmation Number: G5Y9EI |
| [redacted] Complainant 1 | Ticket Number: 0068070142654 |
| [redacted] Complainant 2 | 0068070142658 |
| [redacted] Complainant 3 | 0068070142656 |
| [redacted] | 0068070142659 |
| | 0068070142655 |
| | 0068070142657 |

Flight

| DATE AND FLIGHT | STATUS | CLASS | SEAT/CABIN |
|---|---|---|---|
| MBJ ▸ ATL \| Thu 23Nov2023 \| DL 1800 \| | OPEN | E | |
| ATL ▸ MKE \| Thu 23Nov2023 \| DL 2970 \| | OPEN | E | |

**Exhibit 3:** Flight confirmation records, received from DOL-WHD, for the November 24, 2023, travel of four H-2B workers from Milwaukee, Wisconsin to Seattle, Washington on Alaska Airlines. (Your Affiant as redacted the four travelers' names and annotated in red where the names of Complainants 1-3 appear on the document):

11/24/23, 10:33 AM Print - Your Confirmed Reservation

Alaska

Confirmation Code:
ELDXSH

Travelers

[redacted]
E-Ticket: 0278070362076
MP#: Not available
Seats: MKE-SEA Seat will be assigned

[redacted] Complainant 1
E-Ticket: 0278070362077
MP#: Not available
Seats: MKE-SEA Seat will be assigned

[redacted] Complainant 2
E-Ticket: 0278070362078
MP#: Not available
Seats: MKE-SEA Seat will be assigned

[redacted] Complainant 3
E-Ticket: 0278070362079
MP#: Not available
Seats: MKE-SEA Seat will be assigned

| Flight | Departs | Arrives |
|---|---|---|
| Alaska 323 | | |
| Saver (X) \| Nonstop | Milwaukee (MKE) Fri, Nov 24 2:30 pm | Seattle (SEA) Fri, Nov 24 4:55 pm |
| Distance: 1,689 mi \| Duration: 4h 25m | | |

Flight
The total price for your flight(s) is not available.
For additional assistance with your reservation, call us at 1-800-252-7522 for assistance.

**Exhibit 4:** An email, received from DOL-WHD, from Business 2 to an SSRU email address, tanique@solnrus.com, regarding Complainant 1's work performance in Washington. (Your Affiant has redacted business and employee names and annotated in red where Complainant 1's name appears in the email):

---------- Forwarded message ---------
From: Business 2 in Washington [redacted]
Subject: Complainant 1
Date: Thu, Aug 03, 2023, 02:46 PM
To: Tanique <tanique@solnrus.com>

Hello Tanique,

I wanted to reach out to you to give a little feedback about Complainant 1

[redacted] was absolutely fantastic from the moment [redacted] walked into our hotel. [redacted] had come in while everyone at the hotel was still extremely new, and [redacted] was an absolute trooper since day 1. [redacted] always kept a cool, and calm demeanor no matter what situation was thrown at [redacted] and [redacted] always knew when to reach out for help. [redacted] received multiple great reviews from guests, stating that [redacted] was extremely friendly and truly cared about the experience of their stay. [redacted] is a strong, and level-headed person, that always got the job done through rain or shine.. [redacted] was an absolute super star of a supervisor, and I wanted to reach out to you and let you know this. You are welcome to share any of this feedback with [redacted] as well, I just wanted to give you an idea of what a pleasure it was to work with [redacted]. We will miss [redacted] here at [redacted], and hopefully we will get to see [redacted] again in October!

Regards,

[redacted]
Housekeeping Manager

**Exhibit 5:** An email, received from DOL-WHD, 1 from MCINTOSH at keddorhorie@solnrus.com to Business 2, copying tanique@solnrus.com, regarding Complainant 1. Based on a review of state identity documents and a U.S. passport application, Your Affiant recognizes the man depicted at the end of the email, next to the name "Keddorhorie McIntosh" and the title "President CEO/Staffing Solution R Us" as MCINTOSH:

**From:** keddorhorie <keddorhorie@solnrus.com>
**Sent:** Wednesday, November 15, 2023 3:25 PM
**To:** Business 2 in Washington
**Cc:** tanique@solnrus.com
**Subject:** Re:

[EXTERNAL SENDER]

That is correct, [redacted] is currently awaiting [redacted] travel documents by this coming Friday. We will then have [redacted] travel over the weekend.



**Keddorhorie McIntosh**

President CEO | Staffing Solution R Us

608-844-1019

Keddorhorie@solnrus.com

www.solnrus.com

**Exhibit 6:** An image, received from DOL-WHD, of Complainants 1 and 2's pay stubs from SSRU showing purported employment at in Lake Geneva, Wisconsin after SSRU had already moved Complainants to Business 2 in Washington on November 24, 2023. Your Affiant annotates in red where Complainants 1 and 2's names appear on the documents:

**EMPLOYER**
STAFFING SOLUTION R US LLC
1108 EAST MAIN ST, STE 906 #1025
RICHMOND VA 23219

**PAY PERIOD**
Period Beginning: 01/01/2024
Period Ending: 01/14/2024
Pay Date: 01/19/2024
Total Hours: 67.21

**EMPLOYEE**
Complainant 1
Lake Geneva WI 53147

**NET PAY:** $713.18
Acct#....6702: $713.18

**MEMO:**

| PAY | Hours | Rate | Current | YTD |
|---|---|---|---|---|
| Regular Pay | 67.21 | 17.50 | 1,176.18 | 1,176.18 |

| DEDUCTIONS | Current | YTD |
|---|---|---|
| HOUSING | 320.00 | 320.00 |

| TAXES | Current | YTD |
|---|---|---|
| Federal Income Tax | 102.99 | 102.99 |
| WI Income Tax | 40.01 | 40.01 |

| SUMMARY | Current | YTD |
|---|---|---|
| Total Pay | $1,176.18 | $1,176.18 |
| Taxes | $143.00 | $143.00 |
| Deductions | $320.00 | $320.00 |

**EMPLOYER**
STAFFING SOLUTION R US LLC
1108 EAST MAIN ST, STE 906 #1025
RICHMOND VA 23219

**PAY PERIOD**
Period Beginning: 01/01/2024
Period Ending: 01/14/2024
Pay Date: 01/19/2024
Total Hours: 64.73

**EMPLOYEE**
Complainant 2
Lake Geneva WI 53147

**NET PAY:** $570.08
Acct#....3819: $570.08

**MEMO:**

| PAY | Hours | Rate | Current | YTD |
|---|---|---|---|---|
| Regular Pay | 64.73 | 15.50 | 1,003.32 | 1,003.32 |

| DEDUCTIONS | Current | YTD |
|---|---|---|
| HOUSING | 320.00 | 320.00 |

| TAXES | Current | YTD |
|---|---|---|
| Federal Income Tax | 82.24 | 82.24 |
| WI Income Tax | 31.00 | 31.00 |

| SUMMARY | Current | YTD |
|---|---|---|
| Total Pay | $1,003.32 | $1,003.32 |
| Taxes | $113.24 | $113.24 |
| Deductions | $320.00 | $320.00 |

**Exhibit 7:** A partial credit card statement for MCINTOSH, received from DOL-WHD, showing SSRU H-2B visa holders apparently being rerouted from their original final destinations of Milwaukee, Wisconsin to Cleveland, Ohio. Your Affiant annotates in red where H-2B holders (other than Complainants 1-3) petitioned by SSRU are named:

| | | | | | | |
|---|---|---|---|---|---|---|
| 11/17/23 | PRICELINE.COM | | NORWALK | | CT | $382.27 |
| | AMERICAN AIRLINES | | | | | |
| | From: | To: | Carrier: | Class: | | |
| | MONTEGO BAY | CHICAGO O'HARE INT | AA | B | | |
| | | MILWAUKEE GEN MITC | AA | B | | |
| | Ticket Number: 0[redacted] H-2B #1 | | Date of Departure: 11/18 | | | |
| | Passenger Name: [redacted] | | | | | |
| | Document Type: PASSENGER TICKET | | | | | |
| 11/17/23 | PRICELINE.COM | | NORWALK | | CT | $382.27 |
| | AMERICAN AIRLINES | | | | | |
| | From: | To: | Carrier: | Class: | | |
| | MONTEGO BAY | CHICAGO O'HARE INT | AA | B | | |
| | | MILWAUKEE GEN MITC | AA | B | | |
| | Ticket Number: [redacted] H-2B #2 | | Date of Departure: 11/18 | | | |
| | Passenger Name [redacted] | | | | | |
| | Document Type: PASSENGER TICKET | | | | | |
| 11/19/23 | UNITED AIRLINES | | HOUSTON | | TX | $286.90 |
| | UNITED AIRLINES | | | | | |
| | From: | To: | Carrier: | Class: | | |
| | CHICAGO O'HARE INT | CLEVELAND, OHIO,US | UA | 00 | | |
| | Ticket Number: 0[redacted] H-2B #1 | | Date of Departure: 11/18 | | | |
| | Passenger Name: [redacted] | | | | | |
| | Document Type: PASSENGER TICKET | | | | | |
| 11/19/23 | UNITED AIRLINES | | HOUSTON | | TX | $286.90 |
| | UNITED AIRLINES | | | | | |
| | From: | To: | Carrier: | Class: | | |
| | CHICAGO O'HARE INT | CLEVELAND, OHIO,US | UA | 00 | | |
| | Ticket Number: 0[redacted] H-2B #2 | | Date of Departure: 11/18 | | | |
| | Passenger Name: [redacted] | | | | | |
| | Document Type: PASSENGER TICKET | | | | | |

37. After receiving the aforementioned complaints, on March 8, 2024, U.S. DOL Wage and Hour Division interviewed the owner of SSRU, Keddorhorie MCINTOSH. This interview was conducted via video-teleconference software (Microsoft Teams). Victoria McIntosh, MCINTOSH's wife, was also present for a small portion of the interview. The DOL-WHD investigators did not read MCINTOSH or Victoria McIntosh their Miranda Rights, as they were not in custody. The interview was not video- or audio-recorded.

38. Your Affiant has reviewed a report of the interview prepared by DOL-WHD. In summary, MCINTOSH informed a DOL-WHD that MCINTOSH began a janitorial services company out of Richmond, Virginia under the name Staffing Solution R US LLC, d/b/a SOLNRUS, around June 2021. MCINTOSH advised that this was the first season that he had participated in the H-2B program. MCINTOSH employed 50 H-2B workers, that arrived in the United States in groups of ten. The first group arrived November 20, 2023, and the remaining 40 workers arrived in groups of ten every five days. The last group of 10 workers arrived in the United States on December 9, 2023. MCINTOSH claimed that he paid for the visa fees for the H-2B workers that his company employed. MCINTOSH provided his email as keddorhorie@solnrus.com.

39. In order to corroborate the statements provided by the Jamaican H-2B complainants, Your Affiant researched SSRU's use of the U.S. H-2B visa system, which revealed that MCINTOSH, filing without assistance of an attorney or representative, had submitted a U.S. DOL H-2B application (or "ATEC") under case number H-400-23189-175544, which contained the following information:

**Case Creation Date:** July 8, 2023, via internet transmission

**Number of Foreign H-2B Visa Holders Requested:** 50

**Job Order Posted in:** Wisconsin

**Job Address:** Business 1, Walworth County, Lake Geneva, Eastern District of Wisconsin

**Rate of Pay:** $13 per hour

**Weekly Work Hours:** 40 hours per week

**Case Status:** Full Certification by U.S. DOL on September 29, 2023

**Validity Start:** October 1, 2023

**Validity End:** May 31, 2024

40. Upon the U.S. DOL certifying (or approving) the Staffing Solution ATEC, MCINTOSH submitted an I-129 petition, including ATEC information, to DHS' Citizenship and Immigration Service, Petition Number EAC2400258922, which contained the following information:

**Receipt Via Mail:** October 2, 2023

**Number of Foreign H-2B Visa Holders Requested:** 50 Jamaican Workers

**Job Address:** Business 1

**Rate of Pay:** $13 per hour

**Weekly Work Hours:** 40 hours per week

**Case Status:** Approved by U.S. DHS on October 11, 2023

**Intended Dates of Employment:** October 1, 2023, to May 31, 2024

Upon reviewing U.S. consular records, Your Affiant noted that 50 H-2B visas were issued to applicants in Jamaica, including for Complainants 1-3, and the SSRU group of H-2B visa recipients began entering the U.S. between November and December of 2023. Your Affiant notes that nowhere in the aforementioned DOL or DHS application forms executed under penalties of perjury, nor during his interview with federal U.S. DOL Wage and Hour investigators, did MCINTOSH divulge that he or SSRU intended to move or had moved H-2B workers approved to work in Wisconsin to Washington, Ohio, Florida or any other U.S. state outside of Wisconsin.

### C. Continuation of the federal investigation and discovery of a parallel local level investigation.

#### i. Fraudulent contracts filed by SSRU with H-2B petitions

41. SSRU filed one petition for H-2B certifications on behalf of both Businesses 1 and 3 on or about July 8, 2023, which was approved. SSRU had previously filed another H-2B petition on behalf of Businesses 1 and 4 on August 10, 2022, however for unknown reasons, this petition was denied.

42. In support of both of these filings, SSRU provided what were titled "contractual agreements" that it alleged were addendums to contracts it had entered into with each of these businesses. All of the "contractual agreements" were essentially identical—apart from the name of the business and the number of workers requested—and contained similar language and syntax. The addendums expanded the dates of the contracts, committed the businesses to employing a particular number of workers, provided specific worksite addresses, and declared that SSRU and not the businesses would "supervise, direct or otherwise manage" the workers, including compensating and/or dismissing them as SSRU deemed appropriate.

43. During the course of this investigation, Your Affiant has discovered that although representatives of Businesses 1, 3, and 4 did indeed sign contracts with SSRU to recruit workers and staff their businesses, at least three of the four addendums SSRU filed with the petitions were not actually agreed to or signed by

these businesses and were not the authentic contractual amendments between the parties.[13]

44. As described above, the H-2B visa certification petition that SSRU filed on behalf of Businesses 1 and 3 on July 8, 2023 was successful. The "contractual agreement" addendum with Business 3 that SSRU included with that petition was allegedly executed between MCINTOSH and Business 3's Representative on/about May 31, 2023. It stated that Business 3 would engage 20 SSRU housekeeping workers between October 1, 2023 and May 31, 2024.

45. On April 16, 2024, Your Affiant gave Business 3's Representative, whose name and purported signature were on the addendum, an opportunity to review the addendum that SSRU had filed with DOL as part of the H-2B certification process. On April 17, 2024, Business 3's Representative conducted a search of Business 3's records and concluded that while they recognized their name and on the filed "contractual agreement," Business 3's Representative did not, in fact, sign the addendum. Business 3's Representative explained that he/she knew of SSRU and MCINTOSH and had signed an earlier contract with SSRU, however he/she did not recognize the alleged contract addendum that SSRU filed with the H-2B visa petition, and he/she believed his/her signature was placed there without his/her knowledge or consent. The Representative noted that he/she was unable to find any record of this agreement in Business 3's files, including the representative's records, those of Business 3's HR department, or those of their Corporate Director of Compliance and

---

[13] SSRU did not file the original contracts with the H-2B visa petitions—only the unauthorized addendums.

Risk Management, which is the primary holder of all contracts and amendments for Business 3.

46. The "contractual agreement" or addendum that SSRU filed with that same H-2B petition on behalf of Business 1 was allegedly executed between MCINTOSH and a Business 1 Representative on/about May 31, 2023. This alleged contract addendum stated that Business 1 would employ 30 SSRU housekeeping workers between October 1, 2023 and May 31, 2024.

47. Case agents attempted to contact the Business 1 Representative whose name and purported signature appeared on the "contractual agreement," however this individual has not been responsive. To date, Your Affiant has not been able to confirm whether Business 1's Representative actually signed the "contractual agreement" that SSRU filed. Your Affiant notes, however, that this "contractual agreement" was allegedly signed on May 31, 2024, the same date as the forged contractual addendum relating to Business 3. Additionally, Your Affiant subpoenaed Business 1 for records relating to its contracts with SSRU. After reviewing Business 1's production is response to the subpoena, Your Affiant has been unable to locate a "contractual agreement" or addendum between SSRU and Business 1 signed May 31, 2023. Your Affiant thus believes that the addendum SSRU filed for Business 1 was also fraudulent.

48. Additionally, Your Affiant was able to confirm that the alleged "contractual agreement" with Business 1 that SSRU filed in support of the "failed" H-2B visa petition on August 10, 2022 was not legitimate. On June 27, 2024, Your

Affiant spoke with the Business 1 Representative whose name and purported signature appeared on the alleged addendum, which was dated July 22, 2022.[14] This individual explained that he/she did not have authority to sign contracts on behalf of Business 1. He/she confirmed that the addendum appeared to contain his/her signature, however he/she did not recall signing any contracts with SRRU, to include the filed addendum.

49. This "failed" H-2B visa petition from August 2022 also included a purported addendum to the contract between SSRU and Business 4 that used the same language as all of the other "contractual agreements" discussed above. This addendum was allegedly signed on signed on August 5, 2022. Your Affiant spoke with Business 4's Representative, whose name and purported signature appeared on the "contractual agreement" that SSRU filed with Business 4's petition. Business 4's Representative confirmed that Business 4 had engaged SSRU to recruit and hire H-2B workers. On May 23, 2024, Your Affiant showed Business 4's Representative a copy of the alleged "contractual agreement", between Business 4 and SSRU. Business 4's Representative explained that although the document appeared to include his Adobe digital signature, this was not the contract he had signed with SSRU, nor did they have any record of agreeing to a contractual amendment with SSRU.

**ii. Florida-based investigation into SSRU**

50. In late July 2024, Your Affiant learned that two SSRU workers, Complainants 4 and 5, had come forward to a non-governmental advocacy

[14] This is a different individual than the person referenced above as Business 1 Representative, whom Your Affiant has been unable to contact.

organization in Broward County, Florida to report that SSRU had subjected them to forced labor. This resulted in an investigative referral to the Broward County Sheriff's Office (BCSO), who interviewed these Complainants in early July 2024. During these interviews, Complainants 4 and 5 named MCINTOSH as SSRU's CEO, Myron BROWN as SSRU's Development Manager, and Ysanne BEEZER as SSRU's Operations Manager.

51. In the fall of 2023, Complainant 4 was issued an H-2B visa to work in Lake Geneva, Wisconsin. Complainant 4 had learned of the opportunity to perform housekeeping work in Wisconsin via a Zoom call with MCINTOSH in October 2023. Complainant 4 paid a $250 fee to a visa processing agency and $205 to the Jamaican Embassy for a visa, however SSRU never reimbursed Complainant 4 for these expenditures.[15] After this, SSRU advised Complainant 4 to pack clothing and to wait for a call from SSRU about travel arrangements.

52. Near midnight on November 18, 2023, Complainant 4 received a call from an SSRU employee informing him/her that they had booked him/her a ticket to fly to Wisconsin via Orlando, Florida the following day. After Complainant 4 landed in Orlando on November 19, 2023, however, he/she received another call from SSRU instructing him/her and six other H-2B workers with whom Complainant 4 was traveling not to board the flight to Wisconsin, but instead to exit the airport and get into two Uber rideshare vehicles that were waiting for them. The Ubers took them to

[15] According to USCIS, the employer must either pay or reimburse the H2B worker in the first work week for any visa, visa processing, and other related fees incurred by the worker.

a residence in Deerfield Beach, Florida, and two days later Complainant 4 and the other workers began employment for SSRU at a hotel in Boca Raton, Florida.

53. When Complainant 4 began working, SSRU informed him/her that he/she would be responsible for paying an illegal $1,500 "recruitment fee," $250 for his/her flight to the United States, and $100 for the Uber ride from Orlando to Deerfield Beach, all of which would be deducted from Complainant 4's paychecks.

54. Meanwhile, Complainant 5 was already working in the United States for another company on an H-2B visa. After a negative experience, Complainant 5 began looking into other job opportunities and met BROWN. BROWN offered to have Complainant 5's H-2B visa amended for work at a resort in Michigan, and Complainant 5 accepted. In early May 2024, BROWN told Complainant 5 that he had petitioned to amend his/her visa to work for SSRU and advised that he had work for her in Boca Raton, Florida. Complainant 5 accepted this work because he/she believed it was legal, and BROWN arranged for Complainant 5 to be transported to the jobsite. Complainant 5 later learned that SSRU had not, in fact, petitioned for an amendment of Complainant 5's visa. Complainant 5 was injured while working in for SSRU, and BROWN instructed Complainant 5 to lie about how the injury occurred because he/she "shouldn't be working" and had no insurance.

55. Pursuant to instructions from SSRU, Complainants 4 and 5 stayed and worked in South Florida in contravention of what was authorized by their H-2B visas. During this time, SSRU did not provide them with copies of their paystubs, nor did they advise the Complainants how much they were earning during any pay period,

in violation of USCIS regulations. SSRU also took deductions from their pay, including a $100 transportation fee and a $250 housing fee, on a biweekly basis. Complainants 4 and 5 later learned that even though the contract between SSRU and their employer called for them to be paid for 80 hours per week regardless of how many hours they actually worked, they were only paid for their actual hours (ranging between 43 and 75 hours per week).

56. Complainants 4 and 5 and approximately seven other SSRU employees resided in a house that had security cameras on the exterior and interior. SSRU gave them a curfew of 9:00 P.M. and did not allow them to have visitors to the house. Whenever Complainants 4 and 5 or their fellow H-2B workers voiced concerns to SSRU (for instance, regarding their pay), or if they violated any of SSRU's many rules, SSRU threatened them with deportation. They continued to work for SSRU because they did not understand the U.S. immigration system or feel they had any choice.

57. On July 29, 2024, Your Affiant spoke with BCSO investigators and learned that they had interviewed not only Complainants 4 and 5, but also another complainant whose allegations mirrored those made by Complainant 4. Due to the nature of allegations, BSCO indicated they were imminently planning to execute a state search warrant on the residence where the disclosing workers were residing.

**iii. Interviews with additional complainants in Wisconsin**

58. On August 1, 2024, Your Affiant was notified that Complainant 6, a Jamaican national on the SSRU visa petition for work to be done at Business 1 in

Lake Geneva, WI, was working at Business 3 in Wisconsin Dells, despite the fact that Complainant 6's H-2B visa did not permit work in that location and was originally set to expire on May 31, 2024. Your Affiant researched the status of Complainant 6's visa and learned that, on or about January 2, 2024, SSRU had petitioned for an extension for 35 of the original 50 H-2B employees, including Complainant 6 and H-2B Worker 4. That petition (DHS Petition EAC2400250922) purported that SSRU intended to send the 35 extended visa workers to a hotel in Nashville, Tennessee for work to begin April 1, 2024. This extension was approved on March 27, 2024.

59. Your Affiant interviewed Complainant 6 in Wisconsin Dells on August 1, 2024. Complainant 6 explained that he/she had originally worked at Business 1 in Lake Geneva between approximately November 2023 and February 2024, however SSRU moved him/her to Business 3 in Wisconsin Dells in February 2024. Complainant 6 identified "Keddorhorie" (MCINTOSH) as the "big boss" of SSRU. Complainant 6 had met MCINTOSH on one occasion in Lake Geneva, Wisconsin. Complainant 6 said that PEART is a manager for SSRU and oversaw Complainant 6's work, transportation, and housing in Wisconsin Dells.

60. Complainant 6 estimated that he/she often worked hours in excess of 40 hours per week, especially during the summer months in Wisconsin. Complainant 6 often did not get paid for the actual hours he/she had worked.

61. Complainant 6 had to pay approximately $1,500 in order to get an SSRU H-2B visa. Complainant 6 was told by someone from SSRU while he/she was still in Jamaica that the $1,500 would be deducted from his paycheck in small increments.

Complainant 6 recalled that he/she had two installments of $750 for "miscellaneous" deducted from his paycheck after a few pay periods while in Lake Geneva.

62. While working in Lake Geneva, Complainant 6 lived in a house in Lake Geneva with other SSRU Jamaican H-2B workers. The house was set up by SSRU and had cameras that monitored the common living areas. Complainant 6 knew that SSRU staff was monitoring the cameras because an SSRU representative would send a text message to them and tell them to clean up after themselves if the kitchen area was messy with dishes left out.

63. Complainant 6 disclosed that he/she had to pay hundreds of dollars for housing and for transportation provided by PEART, which was deducted from his/her paychecks. On multiple occasions when Complainant 6 complained about his/her pay and what he/she felt were excessive fees, PEART threatened to "cancel" Complainant 6's visa.

64. Complainant 6 explained that he/she had a decent job in Jamaica and noted that because SSRU took significant deductions from his/her pay, he/she was left with barely enough money to buy food and insulin for his/her diabetes and to support his/her child in Jamaica. Your Affiant is aware that a common scheme utilized to defraud of H-2B workers is to charge the employees high dollar fees for rent and transportation in order to continue financial hardship of the employee. While in a financial hardship situation, H-2B workers often feel as that they cannot afford to leave the situation they are in, and therefore continue to work.

65. Complainant 6 said PEART had told Complainant 6 that he/she had been granted an extension of his/her H-2B visa, but Complainant 6 had not heard anything from PEART or anyone else at SSRU about work in Nashville, Tennessee or being moved to Nashville.

66. Your Affiant also interviewed Complainant 7 on August 1, 2024, at Business 3, where he/she was working. Complainant 7 entered the United States on November 9, 2024, on the same visa as previously mentioned that was for work to be at Business 1 in Lake Geneva, WI on behalf of SSRU. Complainant 7 became aware of SSRU while at home in Jamaica from a referral from a friend, as well as observing SSRU's Instagram and Tik-Tok social media accounts. Complainant 7 reported paying a small visa fee to someone from SSRU in Jamaica and did not recall SSRU company representatives' names other than the local Wisconsin manager, "Mr. Vickacey" (PEART).

67. After BSCO executed the search warrant on the house where Complainant 4 and other SSRU workers had been living, Your Affiant again spoke with BSCO investigators. The investigators informed Your Affiant that they had encountered additional individuals working for SSRU at the house and had also located video recording devices inside the residence, as reported by Complainant 4.

68. On August 2, 2024, Your Affiant interviewed Complainant 8. Complainant 8 applied to SSRU while he/she was in Jamaica and was told that he/she would be doing housekeeping work in Lake Geneva, Wisconsin. Complainant 8 entered the United States in late 2023 on an H-2B visa that authorized him/her to

work for SSRU at Business 1 in Lake Geneva. Complainant 8 flew from Jamaica to Orlando, Florida, where he/she remained for approximately three weeks before being told that he/she was going to Wisconsin. Complainant 8 flew to Milwaukee, but despite the fact that he/she was authorized to work in Lake Geneva, SSRU routed Complainant 8 on a Greyhound bus to Wisconsin Dells. Once Complainant 8 arrived in Wisconsin Dells, PEART picked up Complainant 8 and drove him/her to an apartment complex close to Business 3, where Complainant 8 then worked for SSRU.

69. Complainant 8 paid $250 to someone from SSRU in Jamaica to process his/her visa application, even though Complainant 8 filed out his/her own visa application. Complainants 8 was also charged $1,800 for visa fees, which was deducted in smaller sums from his/her first few SSRU paychecks.

**iv. Wage and tax discrepancies in workers' paychecks**

70. In order to determine whether SSRU was in compliance with H-2B wage requirements, Your Affiant researched nationwide wage reporting for the 50 H-2Bs discussed in this affidavit who were originally brought to the U.S. by SSRU in November 2023 on ATEC number H-400-23189-175544. Although employers reporting workers—including H-2B visa employees—as "W2" or "taxable" employees must generally report quarterly wages to the State Workforce Agency in the state in which workers perform work, and to the U.S. Internal Revenue Service, Your Affiant could only locate U.S. Social Security Numbers for 29 of the 50 SSRU H-2B visa workers.

71. Additionally, the Department of Labor conducted a national wage check, which revealed that 96% of these workers had no wages reported by any employer in any state. This was inconsistent with paycheck deductions described by the complainants. For instance, despite the fact that no wages were reported for them, Complainants 8 and 9 reported seeing Wisconsin State taxes being listed as deductions on their paystubs. Complainant 1 provided DOL-WHD an example of a paystub reflecting similar "Wisconsin tax" deductions from checks he/she received while working in the state of Washington.

72. The Wisconsin Department of Workforce Development (DWD) was contacted to see whether "Staffing Solution R Us LLC" had reported any wages in Wisconsin. DWD's records reflected that SSRU only reported wages during the fourth quarter of 2022 for one of person, in the amount of $999.28. Since then, there have been no additional wages reported to Wisconsin DWD by Staffing Solution R Us LLC, despite a large number of SSRU H-2B workers being approved to work in Wisconsin since that time. Your Affidavit knows from training and experience that it is the employer—in this case, SSRU (and not the hospitality companies who contacted with SSRU)—who must pay taxes and report wages in the state where an employee has worked.

**D. Probable Cause Concerning SSRU's Instagram Account**

73. Through open-source internet research during the summer of 2024, Your Affiant learned that SSRU has a website at the URL "solnrus.com," which lists, among other things, company services and contact information. Within an

"Employers" tab on the solnrus.com website, Your Affiant located a "slideshow" showing the names of various hospitality industry clients of SSRU, including Businesses 1, 3 (located in Wisconsin), and Business 2 (located in Washington).

74. SSRU also maintains a public **Instagram** page under the same name used for the company's website, **solnr_us**.[16] Publicly posted on SSRU's **Instagram** page were multiple pictures of SSRU workers being presented awards by, among others, an individual Your Affiant recognized from comparison of his photo to U.S. visa and immigration records queries as Vickacey PEART (the individual named by Complainant 3 as a Wisconsin-based manager for SSRU who was brought to the U.S. on the same H-2B visa application as Complainant 3, as described above).

75. On or about April 6, 2024, SSRU's **solnr_us** Instagram account publicly posted several images, including:

> **Exhibit 8:** Photos depicting an award from SSRU for "Employee of the Month—March" presented to H-2B Worker 3, whom Your Affiant recognizes from comparison to H-2B Worker 3's visa, at what appears to be a hotel in Tallahassee, Florida, as seen in the top left corner of the second image. H-2B Worker 2 entered the United States on a visa petition for Business 1 in Lake Geneva, WI. Your Affiant is not aware of any update or amendment to H-2B Worker 3's visa that would allow him to work in Florida. Your Affiant has redacted the name and image of the H-2B visa holder, as well as the name of the non-SSRU business and the image of its representative

[16] As of October 7, 2024, "Solnr_us" is still an active Instagram account.







76. On or about April 15, 2024, SSRU's **solnr_us** Instagram account publicly posted several images, including:

> **Exhibit 9:** Images depicting "Rock Star of the Month—February 2024" awards given to two Wisconsin H-2B holders: H-2B Workers 4 and 5. In the second photo of this series, Your Affiant recognizes SSRU manager PEART as the individual in the blue polo shirt on the left side of the photograph. Your Affiant has redacted the names and images of the H-2B visa holders and Business 3's representatives in the light blue and red long sleeve-shirts. At the time these photos were posted, H-2B Worker 4 was supposed to be working for a business in Nashville, TN, per the February 2024 extension discussed above, which had a start date for the Nashville business of April 1, 2024. Your Affiant has reviewed timesheets

subpoenaed from Business 3, which show that H-2B Worker 4 continued to work at Business 3 until July 21, 2024.







77. On June 11, 2024, a series of five images were posted to the **solnr_us** Instagram account, including the following:

**Exhibit 10:** Photos depicting an H-2B visa worker hereinafter referred to as Complainant 6 receiving a “Rock Star of the Month—May 2024” award at a hotel in Wisconsin Dells, Wisconsin, as identified by the uniform of maroon shirt with Business 3’s logo and black pants. Your Affiant recognizes Complainant 6 from his H-2B visa photograph and from meeting him. Your Affiant has redacted Complainant 6’s name and image, as well as the name of a representative of Business 3.







78. On the afternoon of August 1, 2024, after the investigative actions described above taken in Wisconsin and Florida, Your Affiant viewed the **solnr_us** Instagram page and noted that someone had removed all publicly available images of any SSRU workers receiving awards from the **solnr_us** Instagram account. Your

Affiant, however, had previously sent a preservation request to Meta, Inc. in order to preserve all data on the **solnr_us** account on July 31, 2024. Meta Inc. confirmed receipt of the preservation request on July 31, 2024.

**E. Probable Cause Concerning the Target Titan Email Accounts**

79. Based on training and experience, Your Affiant is aware that staffing agencies commonly use email communications to advise their client businesses when new employees are going to arrive at their locations, to include the employees' names and the positions they have been recruited to fill. Staffing agencies also commonly include invoices that list the employees' hours and rates of pay. Emails may also discuss other staffing issues, such as planned or unexpected employee departures. Based on the investigation to date, these generalities appear to be true here.

80. During the course of this investigation, Your Affiant has subpoenaed business records that shed light on the relationships between SSRU and its client businesses from the Businesses mentioned in this Affidavit. Among the records Your Affiant has received to date and reviewed are emails exchanged between representatives of SSRU and representatives of their client Businesses who were subpoenaed. Your Affiant has also reviewed SSRU emails obtained from H-2B visa petitions. These emails demonstrate that SSRU employees and representatives used their company email addresses to discuss the H-2B Workers and Complainants discussed in this Affidavit, as well as SSRU's business more generally with their client Businesses. Your Affiant is aware that SSRU officers and employees are located

in various different states, and emails appear to be a common way in which they communicate with one another and with their client businesses.

81. It is Your Affiant's understanding that the target **Titan** email accounts are used by the following people:

a. **Keddorhorie@solnrus.com**
   i. Keddorhorie MCINTOSH
   ii. Job Title: President and CEO
   iii. **Exhibit 10**: As described above, Your Affiant recognizes MCINTOSH as the individual in the photograph that is part of the keddorhorie@solnrus.com signature block seen in emails collected from witnesses during this investigation.




b. **Marvin@solnrus.com**
   i. Marvin Smith
   ii. Job Title: Program Coordinator

**Exhibit 11:** The case file for DOL Employment and Training Administration Case Number H-400-22222-409295, which was another ETA filing by SSRU to obtain H-2B workers, contains an email sent from marvin@solnrus.com on September 13, 2022 that is signed "Marvin Smith" and that attaches a "revised recruitment report."

**From:** Marvin Smith <marvin@solnrus.com>
**Sent:** Tuesday, September 13, 2022 5:15 PM
**To:** TLC, Chicago - ETA SVC <tlc.chicago@dol.gov>
**Subject:** ATTN. H-2B: H-400-22222-409295 REVISED RECRUITMENT REPORT

**CAUTION: This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.**

Please see the attachment for the above-mentioned document. (CASE # H-400-22222-409295)

Best Regards,

Marvin Smith
Staffing Solution R Us
Program Coordinator
https://www.solnrus.com/

iii. Marvin Smith (DOB X/X/1978) has a prior federal conviction from the Middle District of Florida (6:18-cr-00081-CEM-G_K) for fraud and misuse of visas, permits, and other documents in violation of 18 U.S.C. § 1549(a). The factual basis in Smith's plea agreement reflects that Smith admitted to engaging in a scheme of misusing the H-2B visa program via fraudulent contracts in a manner similar to what Your Affiant has observed and described in this affidavit with respect to SSRU's H-2B practices. The fraudulent contracts underlying that case listed were filed without the knowledge or consent of the businesses on whose behalf they were purportedly filed and contained forged signatures.

c. **Myron@solnrus.com**

i. Myron BROWN

ii. Job Title: Business Development Manager

iii. Your Affiant learned that Business 5 wanted to stop working with SSRU due to disciplinary issues with some of the workers staffed by SSRU. Business 5 sent an email to BROWN, along with others from SSRU, to notify them that Business 1 would be ending their business relationship with SSRU. BROWN responded to Business 5 by sending a contract that appeared to be an altered version of the original (authentic) contract between the parties, in that it contained an added clause requiring Business 5 to give SSRU greater advance notice of any intention to terminate the contract. The email below references a phone call that was had between the parties where the matter was resolved, and Business 5 and SSRU ceased working with one another in July of 2024.

iv. **Exhibit 12:** Your Affiant obtained Exhibit 12 from Business 5.

Re: No Staffing Solutions allowed on property — Business #5 Representatives

Reply | Reply All | Forward | ...

MB Myron Brown <myron@solnrus.com>
To [redacted]
Cc Keddorhone McIntosh; [redacted] shinel@solnrus.com
Tue 7/30/2024 3:33 PM

If there are problems with how this message is displayed, click here to view it in a web browser.
Click here to download pictures. To help protect your privacy, Outlook prevented automatic download of some pictures in this message.

Dan,
Yes, we can jump on at 4:00 PM.

**Myron Brown**
Business Development Manager
STAFFING SOLUTION R US

770-202-2657
Myron@solnrus.com
www.solnrus.com

**d. Shinel@solnrus.com**

i. Shinel Dixon

ii. Job Title: Project Manager

iii. **Exhibit 13:** Your Affiant obtained Exhibit 13 from Business 5. Your Affiant learned from Business 5, that Shinel Dixon was the Lake Geneva area manager for SSRU, including serving as the point of contact for all local SSRU related issues and organizing the arrivals and departures of all SSRU employees.

S Shinel <shinel@solnrus.com>
To
Cc Business #5 Representatives

Reply | Reply All | Forward
Sat 7/20/2024 1:

If there are problems with how this message is displayed, click here to view it in a web browser.
Click here to download pictures. To help protect your privacy, Outlook prevented automatic download of some pictures in this message.

Hello Ben,
I will be there on Wednesday.

**Shinel Dixon**
Management Coordinator
STAFFING SOLUTION R US

770-202-2604
Shinel@solnrus.com
www.solnrus.com

**e. Vickacey@solnrus.com**

i. Vickacey PEART

ii. Job Title: Quality Assurance Specialist/Client Relationships Specialist[17]

iii. Your Affiant knows of Vickacey PEART through interviews with Complainant 6 and 7. Vickacey PEART is the local

---

[17] Based on the signature block in Exhibit 14 below and the witnesses' statements gathered thus far in this investigation, it appears to Your Affiant that this is PEART's title, although it is abbreviated in his signature.

manager for SSRU for the Wisconsin Dells area and drives SSRU employees to and from work in the Western District of Wisconsin.

iv. **Exhibit 14:** Your Affiant received the Exhibit 13 which is an email footer, from Business 3




**f. victoria@solnrus.com**

i. Victoria McIntosh

ii. Job Title: Human Resources Director

iii. **Exhibit 15:** Your Affiant received Exhibit 15 from DOL-WHD. As explained above, it appears Victoria McIntosh has directed H-2B visa workers to violate the terms of their visas and has made travel arrangements for H-2B workers designed to make it appear as though they will be traveling to and working in the Eastern District of Wisconsin, while actually redirecting them elsewhere. The below email demonstrates Victoria McIntosh's knowledge that the visa petition for Business 1 was for work to be done in Lake Geneva, WI.

IMPOORTANT INFORMATION Inbox

Victoria@solnrus.com 8 Nov

to [redacted]

Good afternoon, all,
As we approach the final stages of the H2B application process, we just wanted to clarify a few information. The position available on the H2B petition is **HOUSEKEEPING**. The pay rate for the position is **$13.00 an Hour**, as stipulated by the labor department. The Resort on the Petition is **THE** [redacted] located at [redacted] Lake Geneva, WI 53147. And [redacted] located at [redacted] Lake Geneva, WI 53147. Housing and Accommodation is provided at **$500 monthly**, located a[redacted] **GENEVA, WI 53147**.

This information is essential and will be needed when passing through customs and immigration.

The WhatsApp link provided below has been established for any further inquiries you may have and for the dissemination of other critical messages that the company may need to convey to you.

Follow this link to join my WhatsApp group: https://chat.whatsapp.com/I6kpDJIlxo85jhqosWvbt3

**Victoria McIntosh**
Human Resource Director
Staffing Solution R Us

**g. Ysanne@solnrus.com**

i. Ysanne Beezer

ii. Job Title: Financial Controller

iii. **Exhibit 16:** This exhibit is an example of an email between Beezer and Business 5, obtained with a subpoena issued to Business 5. It discusses a deduction for housing added to an invoice for work by employees of SSRU.

YB Ysanne Beezer <ysanne@solnrus.com>
To / Cc: Business #5 Representatives

Reply | Reply All | Forward

Tue 7/30/2024 8:3

If there are problems with how this message is displayed, click here to view it in a web browser.
Click here to download pictures. To help protect your privacy, Outlook prevented automatic download of some pictures in this message.

Good morning Carol,

Kindly confirm the invoice was received and is correct.

Ysanne Beezer
Financial Operations Manager
Staffing Solution R Us

770-202-2605
Ysanne@solnrus.com
www.solnrus.com

82. Prior to November 20, 2023, a former SSRU project manager named Milton Maise was Business 3's point of contact at SSRU. On November 20, 2023, Ysanne Beezer (Ysanne@solnrus.com) and Vickacey PEART became the new SSRU contacts for Business 3, as reflected in an internal email from Business 3 about 20 new H-2B workers who were slated to arrive at Business 3 the following week, seen in **Exhibit 17** below.[18] Your Affiant received Exhibit 17 from Business 3.

**From:** [redacted]
**Sent:** Monday, November 20, 2023 1:48 PM
**To:** [redacted]
Business #3 Officials
[redacted]
**Subject:** New SSRU Contacts
**Importance:** High

Hello!

Apparently Milton is no longer with Staffing Solutions R Us and our new contacts are:

Ysanne Breezer, ysanne@solnrus.com
Vickarey , vickarey@solnrus.com

They stopped by HR this morning to let me know that they will have 20 new arrivals begging next week. I asked Ysanne to send me a list of names and job assignments for these 20 as well as anticipated start dates so that we can be prepared for their arrival. As soon as I have that I will share with you as well!

Thank you!
[redacted]

83. In May of 2024 and June of 2024, Business 3 representative received emails from BROWN (**myron@solnrus.com**) who, per the signature block, is a business development manager for SSRU. The subject line of the emails was

[18] Your Affiant notes that although the email in Exhibit 17 misspells both Beezer and PEART's names, as well as PEART's email address, it is clear from the rest of the email and from Your Affiant's investigation these are the individuals to whom the email refers.

"MONTHLY CHECK-IN," and MCINTOSH, Victoria McIntosh, PEART, Ysanne Beezer, and Shinel Dixon were copied.

**Exhibit 18:** In the email sent on May 1, 2024, BROWN introduced himself and the purpose behind the monthly check-ins:

MONTHLY CHECK-IN

MB Myron Brown <myron@solnrus.com>

Reply | Reply All | Forward | ...

To [redacted] Business 3 Recipients

Wed 5/1/2024 8:15 AM

Cc keddorhorie; Victoria McIntosh; Shinel@solnrus.com; vickacey; Ysanne

If there are problems with how this message is displayed, click here to view it in a web browser.
Click here to download pictures. To help protect your privacy, Outlook prevented automatic download of some pictures in this message.

This message originated from outside your organization

Good Morning All,

My name is Myron Brown, and I am excited to formally introduce myself as the new Business Development Manager at Staffing Solutions R Us. I am deeply committed to propelling growth and cultivating strategic alliances. Our company prides itself on delivering outstanding service to our clients, and I am eager to contribute to this culture of excellence.

I will conduct monthly check-ins to strengthen our partnership and foster open communication to assess our overall performance. This collaborative approach will enable us to identify areas for improvement and celebrate successes together. Specifically, I am keen to receive updates on metrics such as average cleanliness and other pertinent scores.

Furthermore, I am interested in your feedback on the effectiveness of our Quality Assurance Specialist/Manager and how we can further enhance our collaboration for mutual benefit. Your insights will be instrumental in ensuring that the assigned specialist consistently meets or surpasses your expectations.

At Staffing Solutions R Us, we recognize the significance of upholding high service standards. Our on-site Quality Assurance Specialist/Manager is dedicated to supporting team members and upholding, enhancing, and preserving our standards.

We are committed to our partnership and remain dedicated to delivering exceptional service. Thank you for your continued collaboration, and I look forward to our ongoing success together.

**Myron Brown**
Business Development Manager
Staffing Solution R Us

404-438-4028
Myron@solnrus.com
www.solnrus.com

**Exhibit 19:** The June 2024 email from BROWN was similar to the May 2024 email and solicited feedback from Business 3:

MONTHLY CHECK-IN

MB Myron Brown <myron@solnrus.com> Business 3 Recipients

To [redacted]

Cc Keddorhorie McIntosh; Victoria McIntosh; Ysanne; Shinel@solnrus.com; Vickacey@solnrus.com

Reply | Reply All | Forward | ...

Tue 6/4/2024 10:15 AM

If there are problems with how this message is displayed, click here to view it in a web browser.
Click here to download pictures. To help protect your privacy, Outlook prevented automatic download of some pictures in this message.

This message originated from outside your organization

Good Morning All,

As part of our unwavering commitment to fostering growth and cultivating strategic alliances, I am reaching out for our monthly check-in. This check-in is a testament to our dedication to delivering outstanding service to our valued clients, and I am committed to contributing to this culture of excellence.

To fortify our partnership, we strive to uphold transparent communication about our team members' performance, their contributions to cleanliness, and other pertinent metrics. Your input in this process is valuable and crucial, as it directly influences the quality of service we provide.

Your feedback on the performance of our Quality Assurance Specialist/Manager is not just important, it's crucial. It's a critical factor in shaping the effectiveness of our team and ensuring we consistently meet or surpass your expectations. Please let me know if the specialist/Manager continues to provide the necessary support to the team members, contributing to our shared goal of excellence.

We sincerely appreciate your ongoing partnership and support. Your trust in Staffing Solutions R Us is appreciated and instrumental in our success. We look forward to continuing to serve you excellently.

**Myron Brown**
Business Development Manager
STAFFING SOLUTION R US

404-438-4028
Myron@solnrus.com
www.solnrus.com

84. Among the emails received from Business 3 were conversations regarding employees for SSRU coming and going, as seen in the email contained in **Exhibit 20** below, in which Complainants 6 and 7 are mentioned.

**Exhibit 20**: This email was originally sent from PEART to Representatives of Business 3 on March 13, 2024 and forwarded internally within Business 3 on March 14, 2024. It concerned five new H-2B workers who were to begin work on March 15, 2024, including Complainants 6 and 7.

FW: New Staff

JS [redacted] Business 3 Recipients

Reply | Reply All | Forward | ...

Thu 3/14/2024 11:48 AM

This message was sent with High importance.
Click here to download pictures. To help protect your privacy, Outlook prevented automatic download of some pictures in this message.

fyi

**From:** vickacey <vickacey@solnrus.com>
**Sent:** Wednesday, March 13, 2024 10:25 PM
**To:** [redacted] Business 3 Recipient
**Subject:** New Staff

This message originated from outside your organization

Good evening Joe,

The following team members will have tonight and will yet to join the team and begin employment on Friday, March 15, 2024.

1. [redacted]
2. [redacted]
3. [redacted] Complainant 6
4. [redacted]
5. [redacted] Complainant 7

**Vickacey Peart**
Qual. Assur. Spec. Client Relatsh. Spec
Staffing Solution R Us

608-432-8835
Vickacey@solnrus.com
www.solnrus.com

85. Your Affiant also reviewed emails between SSRU and Business 4. Your Affiant observed that the email address "**admin@solnrus.com**" sent 24 emails to Business 4 representatives regarding invoices between April 11, 2022, and May 23, 2023. From the records provided by Business 4, Your Affiant is aware that SSRU had Jamaican nationals working at Business 4 without legal authorization.[19]

[19] As discussed above, SSRU's August 10, 2022 H-2B visa petition on behalf of Business 4 was never approved.

**Exhibit 21**: This email is an example of an invoice sent by **admin@solnrus.com** to Business 4 on July 6, 2022.

Business 4 [redacted]

**New payment request from Keddorhorie Mcintosh - invoice 1111**
4 messages

**STAFFING SOLUTION R US LLC** <quickbooks@notification.intuit.com> Wed, Jul 6, 2022 at 11:40 AM
Reply-To: Admin@solnrus.com
To: [redacted]
Cc: Keddorhorie@solnrus.com, Victoria@solnrus.com, Ysanne@solnrus.com, kimani@solnrus.com, andre@solnrus.com, [redacted]
mkolar@charcap.com

INVOICE 1111 DETAILS

STAFFING SOLUTIONS R US
WHERE QUALITY EXCEEDS EXPECTATION

STAFFING SOLUTION R US LLC

DUE 07/22/2022

**$48,801.06**

Print or save

Powered by QuickBooks

Dea[redacted]

Attached is a detailed breakdown of the invoice. Please verify then approve, responding with all parties CC on this email.

Have a great day!
STAFFING SOLUTION R US LLC

Bill to Business 4 [redacted]

## GENERAL KNOWLEDGE CONCERNING INSTAGRAM

86. Meta, Inc. owns and operates two social networking websites: Facebook and Instagram.

87. Instagram is a free-access social networking service, accessible through a website (https://www.instagram.com) and a mobile application that allows subscribers to acquire and use Instagram accounts, like the **solnr_us** account discussed here, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

88. Meta collects basic contact and personal identifying information from users during the Instagram registration process. This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address, telephone numbers, credit card or bank account number, and other personal identifiers. Meta keeps records of changes made to this information.

89. Meta also collects and retains information about how each user accesses and uses Instagram. This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

90. Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time. Instagram users can create multiple

accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

91. Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account. Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality. For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account, or transfer an image from Instagram to a connected image printing service. Meta maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

92. Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers). Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments. Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

93. Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users. Meta retains this contact data unless

deleted by the user and periodically syncs with the user's devices to capture changes and additions. Users can similarly allow Meta to search an associated Facebook account for friends who are also Instagram users. Users can also manually search for friends or associates.

94. Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings. Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

95. One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos. Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location. These appear as posts on the user's profile. Users can remove posts from their profiles by deleting or archiving them. Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

96. Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram. Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@"). An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

97. An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours. Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted. The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

98. Instagram allows users to broadcast live video from their profiles. Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

99. Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups. These messages may include text, photos, videos, posts, videos, profiles, and other information. Participants to a group conversation can name the group and send invitations to others to join. Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings. Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot. Instagram Direct also enables users to video chat with each other directly or in groups.

100. Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other

associated websites and apps. Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

101. Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag. Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be “followed” to generate related updates from Instagram. Meta retains records of a user’s search history and followed hashtags.

102. Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

103. Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content. Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers. This data can provide insights into a user’s identity and activities, and it can also reveal potential sources of additional evidence.

104. In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain

records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

105. For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

106. In my training and experience, evidence of who was using Instagram and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records in the possession of Meta Platforms. Due to the nature of this investigation, the images depicted in Exhibit's 8, 9 and 10 of this Affidavit are direct evidence the SSRU had knowledge of their employees working at locations not reported to DOL. Your Affiant is aware the Meta Platforms maintains draft images, as well as communications. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. For example, the stored communications and files connected to an Instagram account may provide direct evidence of the offenses under investigation. Based on my training and experience, [[instant messages, voice messages, photos, videos, and documents]] are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Your Affiant seeks these records as since, Exhibit's 8, 9

and 10 were posted to the SSRU public Instagram account, Your Affiant seeks information on who posted the images and if there are saved drafts, depicting other H-2B workers in locations in which they should not be working.

107. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Meta can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, messaging logs, photos, and videos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

108. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

109. Other information connected by Instagram may lead to the discovery of additional evidence. For example, associated and linked accounts, stored communications, photos, and videos may reveal evidence of the crimes under investigation and/or communications between co-conspirators. This evidence can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

110. Therefore, Meta's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## BACKGROUND CONCERNING TITAN MAIL

111. Titan Mail, which is based out of the United Arab Emirates offers services to business around the world.

112. Titan hosts email addresses for business that allows for the user to set up an email address, send and receive emails, and stores related files on a server. This service is available on both desktop and laptop computers, along with on mobile devices.

113. A Titan email address can send and receive calendar invites from other platforms such as Gmail, Outlook, and Apple. A Titan calendar can be shared with other users of Titan Mail.

114. In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

115. In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

116. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

117. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email

account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

**CONCLUSION**

118. Based on the forgoing, I request that the Court issue the proposed search warrants.

119. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of these warrants. The government will execute these warrants by serving the warrants on **Meta** and **Titan/Flock**, who will then compile the requested records at a time convenient to them. Therefore, reasonable cause exists to permit the execution of the requested warrants at any time in the day or night.

## ATTACHMENT A

### Premises to be Searched

This warrant applies to information associated with the following email accounts that is stored at premises owned, maintained, controlled or operated by Titan Mail and/or their registered agent, Flock FZ-LLC DMCC, located at DMCC Business Center, Level No. 1, Unit No. 1626, PO Box No. 337316, Jewellery 7 Gemplex 3, Dubai, United Arab Emirates.

| Email Address: |
|---|
| Admin@solnrus.com |
| Vickacey@solnrus.com |
| Victoria@solnrus.com |
| Keddorhorie@solnrus.com |
| Ysanne@solnrus.com |
| Shinel@solnrus.com |
| Marvin@solnrus.com |
| Myron@solnrus.com |

## ATTACHEMENT B

### Particular Things to be Seized

### I. Information to be disclosed by Titan Mail/Flock FZ-LLC DMCC

To the extent that the information is within the possession, custody, or control of Titan Mail and/or Flock FZ-LLC DMCC, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, Titan Mail and/or Flock FZ-LLC DMCC is required to disclose the following information to the government for each account listed in Attachment A for the period of May 1, 2023 to the present:

(a) All records or other information regarding the identification of the accounts, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the accounts were created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

(b) The types of service utilized, including the start date and length of service for each account;

(c) The contents of all emails associated with the accounts, including stored or preserved copies of emails sent to and from the accounts, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

(d) All records or other information stored by any individual using the accounts, including address books, contact and buddy lists, all calendar data, pictures, and files; and

(e) All records pertaining to communications between Titan Mail/Flock and any person regarding the accounts, including contacts with support services and records of actions taken.

Titan Mail and Flock FZ-LLC DMCC are hereby ordered to disclose the above information to the government within **14 DAYS** of the issuance of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes evidence and/or instrumentalities of violations of violations of Title 18, United States Code, Sections 1589(a) (forced labor), 1546(a) (fraud and misuse of visas, permits, and other documents), 1351 (fraud in foreign labor contracting), 1343 (wire fraud), and 1001(a) (false statements); and Title 8, United States Code, Sections 1324(a)(1)(A)(iii) and (B)(i) (bringing in and harboring certain aliens for financial gain), those violations involving Keddorhorie McIntosh and/or Staffing Solution R Us and its employees and occurring after May 1, 2023, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Evidence of the target(s)' misuse of the H-2B visa program, including communications regarding the details of H-2B visa petitions, the identities of H-2B workers recruited and/or employed by the targets, all details related to travel, employment, housing, and payment of H-2B workers, fees charged to H-2B workers or applicants in relation to obtaining H-2B visas and employment, and means used to convince, coerce, or compel H-2B workers to accept to remain in employment, including employment other than that allowed by the terms of their visas;

(b) Evidence of the absence of certain records or communications, including a lack of communication between the target(s) and certain businesses on whose behalf the target(s) purported to file visa amendment or extension applications;

(c) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owners;

(d) Evidence indicating the email account owner's state of mind as it relates to the crime under investigation, including consciousness of guilt or attempts to conceal or destroy evidence after the targets learned they were under investigation;

(e) Evidence of the identity of the person(s) who created or used the target accounts, including records that help reveal the whereabouts of such person(s); and

(f) Evidence of the identity of the person(s) or businesses who communicated with the target accounts about the recruitment or employment of H-2B visa workers, including records that help reveal their whereabouts.